Filed 6/27/13  Bowers Companies Wage and Hour Cases CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| BOWERS COMPANIES WAGE AND HOUR CASES. | G046104<br><br>(JCCP No. 4620; O.C. Super. Ct. No. 30-2009-00241881; L.A. Super. Ct. No. BC430069)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Nancy Wieben Stock, Judge.  Affirmed in part, reversed in part, and remanded.

Law Offices of Joseph Antonelli, Joseph Antonelli, Janelle C. Carney; Quintilone & Associates, Richard E. Quintilone II, Jesse M. Bablove; Law Offices of Kevin T. Barnes, Kevin T. Barnes, Gregg Lander; Carter Law Firm, Roger R. Carter; Phelps Law Group, Marc H. Phelps; Cooper Law Firm and Scott B. Cooper for Plaintiffs and Appellants.

Silverstein & Huston, Steven A. Silverstein, Mark W. Huston and Robert I. Cohen for Defendants and Respondents.

\*          \*          \*

Plaintiffs and appellants Williams Gonzales and Joshua Kahane (collectively, Plaintiffs) appeal from the trial court's order denying their motion to certify five separate classes against Plaintiffs' former employers, defendants and respondents Bowers Companies, Inc. (Bowers) and Pacific Ambulance, Inc. (Pacific; collectively Defendants).

We reverse the trial court's order denying Plaintiffs' motion to certify classes based on Defendants' alleged failure to pay straight time using the proper regular hourly rate and Defendants' alleged failure to pay overtime compensation for all overtime hours worked. Defendants concede they paid Plaintiffs and other similarly situated employees regular and overtime compensation based on uniform policies consistently applied to readily ascertainable groups of employees. As a result, Plaintiffs' challenges to the legality of those uniform policies present common issues properly subject to class treatment. We remand this matter to the trial court with directions to certify Plaintiffs' regular hourly rate and overtime classes based on modified class definitions consistent with the views expressed herein.

We affirm the trial court's order refusing to certify classes based on Defendants' alleged failure to provide proper meal breaks and paystubs and Defendants' alleged failure to pay all wages due upon termination or resignation. Substantial evidence supports the trial court's finding Plaintiffs' theories of recovery on these claims do not present common issues amenable to class treatment.

I

FACTS AND PROCEDURAL HISTORY

A.      *Defendants' Business and Plaintiffs' Employment*

Defendants are seven-day-per-week, 24-hour-per-day ambulance transportation providers. Although they field some emergency calls, Defendants

2

primarily provide nonemergency transportation between homes, hospitals, doctors' offices, and care facilities. The services Defendants provide include basic life support, advanced life support, nurse staffed critical care support, ICU/PICU transports, special events, standbys/community services, and wheelchair/shuttle transports. Defendants provide these services through ambulance crews that consist of an emergency medical technician (EMT), a paramedic, and a registered nurse or respiratory therapist (collectively, field employees). Nurses and respiratory therapists typically drive a company car and meet the ambulance at the call location. Defendants also employ dispatchers, fleet maintenance employees, administrative staff, and management employees who are considered nonfield employees.

Defendants run their field operations from separate locations in different counties. Bowers operates in Los Angeles County from bases located in Long Beach, Van Nuys, and Lancaster and several hospital deployment centers. Pacific operates in Orange and San Diego Counties from bases located in Lake Forest, San Diego, and Vista and numerous hospital deployment centers. Defendants share common upper management, training staff, payroll providers, and employee manuals, but employ separate dispatchers, supervisors, and ambulance personnel who work out of different facilities throughout the three counties. Ambulance personnel occasionally pick up extra shifts from the Defendant other than the one for whom they primarily work.

Gonzales worked for Bowers as an EMT and then a paramedic from 2007 until August 2011. He worked primarily 12-hour shifts, but also worked shifts of other lengths. Occasionally, Gonzales picked up extra shifts at Pacific. Kahane worked on and off for both Defendants as an EMT between 2006 and 2008.

B.     *Defendants' Pay Policies*

Defendants offer their employees 8-, 10-, and 12-hour shifts, and, until 2010, 24-hour shifts. EMT's and paramedics choose from 8-, 10-, and 12-hour shifts,

3

registered nurses pick from 10- and 12-hours shifts, and respiratory therapists work 12-hour shifts.

In 2000, Bowers' employees voted to approve an alternative workweek schedule of four days per week and 10 hours per day (4/10 Schedule). Pacific's employees voted to adopt the same 4/10 Schedule in 2003. This schedule provided employees with more days off because they could continue to work the same number of weekly hours, but do so in a schedule covering one day less per week. Under this schedule, Defendants paid their employees their regular hourly rate for the first 10 hours of a shift (and the first 40 hours of a week), one and one-half times their regular hourly rate for the next two hours of the shift, and double their regular hourly rate for all hours beyond 12 hours worked during any shift. Before adopting the 4/10 Schedule, Defendants paid employees overtime after they worked eight hours on a shift. Defendants apply the 4/10 Schedule's overtime pay methodology to all field employees working 10- and 12-hour shifts. Bowers reported the results of its vote to the California Department of Industrial Relations as the Labor Code requires, but the Department has no record of receiving any information regarding Pacific's election results.

Following these elections, Defendants required all new employees to sign an "Alternative Work Week Acknowledgment," "agree[ing] to work schedules that require working 10, 11, & 12 hour[] shifts . . . paid at straight time for the first 10 hours and 1 1/2 for the next 2 hours and any hours worked beyond 12 hours are paid at the double time." Although the Acknowledgment refers to 10-, 11-, and 12-hour shifts, the Bowers vote transmitted to the California Department of Industrial Relations only refers to an alternative workweek schedule for 10-hour shifts. There is no evidence in the record regarding the precise terms of Pacific's vote. Through inadvertence, Defendants failed to have a few employees sign the Acknowledgment, including Gonzales, but nonetheless paid those employees under the 4/10 Schedule's methodology.

4

In 2008, Bowers implemented "annualized" pay rates for its field employees because it was having difficulty filling its 8- and 10-hour shifts. Employees appeared to prefer the overtime and additional days off available for working the 12-hour shifts. To attract employees to the 8- and 10-hour shifts, Bowers increased the hourly rate so the amount of annual pay for employees working these shifts was the same as employees working 12-hour shifts. In other words, the increased hourly rate sought to offset the two hours of overtime pay received on every 12-hour shift that was not available on the 8- or 10-hour shifts. In 2010, Pacific adopted the same annualized pay rate methodology, but applied it only to new hires. It now applies to a majority of Pacific's hourly employees.

Under this compensation method, the same employee received a different pay rate depending on the length of the shift. For example, an employee would be paid at one hourly rate for working his or her regularly scheduled 12-hour shift, but the same employee would be paid at a higher hourly rate if he or she traded for or otherwise picked up an 8- or 10-hour shift. The overtime rate an employee received similarly changed depending on the regular hourly rate the employee received during the overtime shift he or she worked. As a result, employees received a higher overtime rate if they worked overtime during an 8- or 10- hour shift than they would receive for working overtime during a 12-hour shift.

C.      *Defendants' Meal Break Policies*

Defendants have a written meal break policy acknowledging employees who work five or more hours in a day are entitled to a 30-minute, unpaid meal break. The policy requires employees to obtain written management approval before missing a break and to document missed breaks on a sign-in sheet. The policy also provides breaks will be scheduled by supervisors at Defendants' discretion.

This policy is implemented for field employees through "posting" time. A dispatcher assigns an ambulance crew to each pick-up and delivery. After the crew completes an assignment, it notifies the dispatcher and the dispatcher assigns the crew to one of numerous predetermined locations to be "at post" until the crew receives its next assignment. While at post, employees are to take their meal break, and notify dispatch they are doing so. Dispatchers use their best efforts to avoid making an assignment to a crew that is on a designated break.

Posting locations are selected to provide food and restroom facilities. Employees may leave the specific posting location and the ambulance if they remain within a reasonable proximity to both. The amount of posting time varies greatly between shifts, locations, and the time of day. The method for taking meal breaks is different for nurses and respiratory therapists than for EMT's and paramedics because nurses and respiratory therapists drive separately and typically meet the ambulances at a pick up or delivery site. They are not required to post in the same manner as EMT's and paramedics.

In late 2010 and early 2011, Defendants began entering into on-duty meal agreements with field employees. These agreements state a paid 30-minute meal break will be provided for all shifts that work more than six hours and a second, paid 30-minute meal break will be provided if an employee works more than 12 hours during a shift. Under these agreements, Defendants required its employees to take meal breaks during posting time, but Defendants could interrupt the breaks if necessary.

D.      *Plaintiffs' Complaints*

In February 2009, Kahane filed a class action complaint against Defendants in Orange County Superior Court. Almost a year later, Gonzales filed a class action complaint against Defendants in Los Angeles County Superior Court. The Judicial

6

Council coordinated the two actions and assigned them to the Orange County Superior Court in May 2010.

In December 2010, Plaintiffs filed the operative first amended consolidated complaint seeking unpaid wages and penalties on behalf of Defendants' nonexempt hourly employees. In general, the complaint alleged Defendants (1) failed to pay employees all straight and overtime wages they earned; (2) improperly reduced employees' regular pay rate when they worked longer shifts; (3) failed to provide employees legally compliant paystubs; (4) failed to provide proper meal and rest periods; (5) failed to pay all wages due upon termination; and (6) failed to reimburse employees for work-related expenses. The complaint sought relief on behalf of eight class and six subclasses of Defendants' former and current employees.

E.    *The Class Certification Motions*

Plaintiffs filed their initial class certification motion in June 2011, asking the trial court to certify eight classes and four subclasses of employees. The court denied the motion with prejudice as to one class and without prejudice as to all other classes and subclasses. Although Plaintiffs filed a large volume of evidentiary materials, the court found Plaintiffs failed to meet their burden of establishing each element necessary to certify the classes and subclasses by a preponderance of the evidence. The court explained Plaintiffs' declarations were conclusory and their moving papers failed to cite the court to specific evidence showing Defendants' alleged wrongdoing could be established on a classwide basis. Finally, the court ruled Plaintiffs could file a supplemental class certification motion and ordered the parties to meet and confer regarding a briefing and hearing schedule.

In October 2011, Plaintiffs filed their supplemental motion for class certification, which revised some of the class definitions and reduced the number of

7

classes to five.[1]  Specifically, Plaintiffs sought to certify the following classes:  (1) "All current and former California hourly employees who work or worked for defendants from February 3, 2005 through the date of judgment, who were scheduled to work and did work over eight (8) hours in a day" (Overtime Class); (2) "All non-exempt persons employed in California who work or worked more than eight (8) hours a day for defendants at any time from February 3, 2005 to the time of judgment who were not properly compensated (straight-time and overtime premium pay) because defendants(s) subjected them to a base, hourly, rate-of-pay cut when working these overtime shifts" (Regular Rate Class); (3) "All California persons employed as hourly, nonexempt employees by defendants from February 3, 2005 to the date of judgment who left defendants' employ without receiving all wages due upon termination" (Waiting Time Class); (4) "All California-based hourly employees employed by defendants [from] February 3, 2005 to the date of judgment, who were not provided legally compl[ia]nt meal periods" (Meal Period Class); and (5) "All California based hourly employees employed by defendants from February 3, 2005 to the date of judgment who were not provided pay stubs that complied with Labor Code § 226, as they fail to list total hours worked and failed to properly calculate employees['] regular rate of pay" (Paystub Class).  (Bold and underscoring omitted.)  At the hearing on the supplemental motion, Plaintiffs further limited these remaining classes to hourly field employees only.  The evidence on the supplemental motion included declarations Plaintiffs submitted from nine former employees and declarations Defendants submitted from 89 current and former employees describing their experiences with Defendants' pay and break policies.

The trial court denied the supplemental motion in its entirety, finding "[t]he Motion relies on incompetent evidence, on conclusory allegations and a litany of law and

---

[1]     Plaintiffs' supplemental motion also included one subclass relating to 24-hour shifts Defendants previously offer some employees.  We do not address this subclass because Plaintiffs do not challenge the trial court's refusal to certify it.

8

argument unsupported by evidence." The court further found Kahane was not an adequate class representative because his declaration failed to show he had any claim against Defendants. On each proposed class, the court found Plaintiffs failed to provide competent evidence "that the class can be ascertained, the number of potential class members, what trial methodology will be used to establish the claims, that common issues predominate, and because of all of this, that certification is a superior mechanism."

On the Meal Break Class, the court also found plaintiffs' theory of recovery that Defendants assigned calls in a manner which did not allow time for meal breaks could not be proven on a classwide basis. On the Paystub Class, the court further found Plaintiffs failed to identify any particular injury caused by the alleged inaccuracies in Defendants' paystubs that could be proven on a classwide basis. Finally, as to whether Plaintiffs' proposed classes were sufficiently numerous, the court found Plaintiffs failed to show Defendants engaged in the alleged misconduct during any specific time period and therefore no particular number of class members could be identified.

The trial court refused to consider Plaintiffs' reply brief and supporting evidence because the briefing schedule to which the parties stipulated did not authorize a reply and the nature of Plaintiffs' motion, as a supplement to the earlier motion, did not warrant one. The court also sustained numerous evidentiary objections Defendants' asserted to some of Plaintiffs' evidence and Plaintiffs do not challenge those evidentiary rulings. Plaintiffs timely appealed.

II

DISCUSSION

A.  *The Trial Court Did Not Abuse Its Discretion in Refusing to Consider Plaintiffs'*
    *Supplemental Reply*

In denying the supplemental certification motion, the trial court refused to consider Plaintiffs' reply brief and supporting evidence because "[t]he prior Order

9

[authorizing the supplemental motion] did not call for a Reply and even if one were allowed, it should not contain evidentiary material, out of fairness to opposing parties." We find no abuse of discretion in the trial court's ruling and likewise refuse to consider Plaintiffs' supplemental reply and supporting evidence.[2]

Trial courts have "broad discretion . . . to regulate the submission of materials in connection with pending motions." (*Hobson v. Raychem Corp.* (1999) 73 Cal.App.4th 614, 625 (*Hobson*), disapproved on other grounds in *Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1031, fn. 6.) In the absence of a prior court order finding good cause for an otherwise unauthorized filing, the decision whether to consider the filing is vested in the trial court's sound discretion, and we will not reverse the exercise of that discretion without a clear showing of abuse. (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 765 (*Bozzi*) [trial court did not abuse its discretion in refusing to consider "'surrebuttal' brief" because filing party failed to show good cause]; *Hobson*, at pp. 624-625 [no abuse of discretion because party failed to establish good cause for filing additional evidence after statutory deadline].)

Here, the trial court denied Plaintiffs' initial class certification motion because it found numerous procedural and evidentiary shortcomings in Plaintiffs' papers. Although not required to do so, the court granted Plaintiffs leave to file supplemental papers to correct those shortcomings. The court instructed the parties to meet and confer on a briefing schedule for their supplemental papers and to submit the agreed-upon schedule for the court's approval.

After the parties agreed on a briefing schedule, Plaintiffs' counsel drafted a stipulation setting forth the schedule and the court entered that stipulation as an order. The order allowed Plaintiffs to file "supplemental certification papers" and Defendants to

---

[2] We nonetheless note the decision we reach on the merits would not change if we considered Plaintiffs' supplemental reply brief and supporting evidence.

10

file "supplemental reply papers." The order did not authorize Plaintiffs to file any documents in response to Defendants' supplemental papers. Nonetheless, Plaintiffs filed a supplemental reply brief and submitted additional evidence to respond to Defendants supplemental papers without obtaining leave to do so. The trial court sustained Defendants' objection to these materials as unauthorized by the stipulation and order.

Plaintiffs contend the trial court abused its discretion in refusing to consider these materials because the court "expressly contemplated" Plaintiffs would file a reply. To support this argument, Plaintiffs cite generic references the trial court made to a possible reply when the court instructed the parties to meet and confer on a briefing schedule. Plaintiffs, however, misconstrue the court's comments. The transcript from the original hearing shows the trial court contemplated the parties would negotiate the schedule they wanted and the court would approve it. The schedule on which the parties agreed and entered as a court order neither authorized nor "contemplated" a reply by Plaintiffs. Contrary to Plaintiffs' suggestion, the order's failure to expressly prohibit a reply did not impliedly authorize one. (See *Shadle v. City of Corona* (1979) 96 Cal.App.3d 173, 178 [absent prior court approval, parties limited to filings authorized by statute or rule].)

If Plaintiffs intended to file a supplemental reply and supporting evidence, it was incumbent on them to include a reply in the briefing schedule they negotiated or obtain the trial court's permission *before* filing the reply and supporting evidence. (See *Hobson*, *supra*, 73 Cal.App.4th at pp. 624-625 [before filing an unauthorized brief or other materials, the filing party must obtain court permission based on a showing of good cause].) Plaintiffs did neither and provide no explanation for those failures.

Nonetheless, Plaintiffs contend the court abused its discretion in refusing to consider the additional evidence they filed with their reply because that evidence "caused no unfairness to Defendants." According to Plaintiffs, the additional evidence did not prejudice Defendants because it simply clarified Plaintiffs' earlier evidentiary

11

submissions and responded to Defendants' arguments without raising any new points. Plaintiffs also argue the additional evidence was not new evidence because Defendants already had obtained the documents during discovery. None of these arguments, however, establish the trial court abused its discretion.

The purported lack of prejudice to Defendants does not establish good cause allowing Plaintiffs to submit evidence after the established deadline. Rather, to justify its unauthorized evidentiary submission, Plaintiffs must show good cause for failing to submit the evidence earlier. (See *Bozzi*, *supra*, 186 Cal.App.4th at p. 765; *Hobson*, *supra*, 73 Cal.App.4th at pp. 624-625.) Plaintiffs did not do so. Their contention the additional evidence merely clarified their earlier submissions does not establish good cause. Under that standard, all law and motion filing deadlines would be meaningless and parties could submit additional evidence at any time if the additional evidence purportedly related to evidence the parties previously filed. Plaintiffs' contention their additional evidence merely responded to arguments Defendants made in their supplemental papers does not establish good cause for the same reason. Allowing additional briefs or evidence after the established deadlines is the exception, not the norm. (See *Hobson*, at p. 625 ["the case law has been strict in requiring good cause to be shown before late filed papers will be accepted"].)

We emphasize the documents at issue are a reply brief and supporting evidence Plaintiffs filed after the trial court denied their initial class certification motion and allowed Plaintiffs to file supplemental papers to correct the many procedural and evidentiary shortcomings the court found in Plaintiffs' initial papers. The trial court allowed Plaintiffs to submit three rounds of briefing and evidence (the original moving papers, the reply on the original motion, and the supplemental moving papers) before it declined to consider another round of supplemental filings. As the court explained in refusing to consider the supplemental reply and supporting evidence, "there was no need for a reply. The effort here was to have the Plaintiffs come in with new and different

12

evidence.  And, of course, the defense had a chance to comment if they wanted to.  But there was no need for any reply, nor was one ordered or permitted."  We find no abuse of discretion in the trial court's ruling.

B.       *General Class Certification Principles*

"""Class actions serve an important function in our judicial system.  By establishing a technique whereby the claims of many individuals can be resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress . . . .""  [Citations.]" (*Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, 1141.)  California's public policy supports using class actions to enforce the state's wage, overtime, and meal and rest break laws.  (*Id*. at p. 1141.)  But "'because group action . . . has the potential to create injustice, trial courts are required to "'carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts.'"'  [Citations.]"  (*Ibid*.)

Class actions are statutorily authorized "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ."  (Code Civ. Proc., § 382.)  The party seeking class certification must establish (1) "the existence of an ascertainable and sufficiently numerous class"; (2) "a well-defined community of interest"; and (3) "substantial benefits from certification that render proceeding as a class superior to the alternatives."  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)  The community of interest requirement in turn requires three additional inquiries:  (1) whether common questions of law or fact predominate; (2) whether the class representatives have claims or defenses typical of the class; and (3) whether the class representatives can adequately represent the class.  (*Ibid*.)  The party seeking class certification must produce substantial evidence establishing each of these elements.  (See

*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108; *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922-923.)

To evaluate the foregoing requirements, the trial court must first identify the class representative's theory for recovering on the class's behalf. "The [class] certification question is 'essentially a procedural one'" that examines whether the class proponent's theory of recovery is amenable to class treatment. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326-327 (*Sav-On*).) A certification motion "'does not ask whether an action is legally or factually meritorious' [citation]," but rather whether the common issues it presents "'are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]" (*Id*. at p. 326; *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 507 (*Mora*) ["the central issue in a class certification motion is whether the questions that will arise in the action are common or individual, not the plaintiffs' likelihood of success on the merits of their claims"].) The court must assume the class claims have merit and resolve disputes regarding the claims' merits only when necessary to determine whether an element for class certification is satisfied. (*Brinker*, *supra*, 53 Cal.4th at pp. 1023-1025.)

"On review of a class certification order, an appellate court's inquiry is narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

14

"When reviewing an order denying class certification, appellate courts 'consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial.' [Citation.]" (*Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1297-1298 (*Jaimez*).) "'Any valid pertinent reason stated will be sufficient to uphold the order.' [Citation.]" (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436.) "When the decision turns on disputed facts or inferences to be drawn from the facts, this court cannot substitute its decision for that of the trial court." (*Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 731-732.)

C.      *The Trial Court Erred in Refusing to Certify the Regular Rate Class*

        1.      Ascertainability

        A class must be ascertainable so notice may be given to the putative class members and it may be determined after the litigation has concluded who is barred from relitigating the issues presented. (*Marler v. E.M. Johansing, LLC* (2011) 199 Cal.App.4th 1450, 1459 (*Marler*).) Courts typically look to the class definition and the means of identifying class members when deciding whether a class is ascertainable. (*Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1207 (*Bufil*).) An ambiguous class definition presents a problem of class ascertainability. (*Cho v. Seagate Technology Holdings, Inc.* (2009) 177 Cal.App.4th 734, 746 (*Cho*).)

        Ascertainability is best "'achieved by defining the class in terms of objective characteristics and common transactional facts . . . .' [Citation.]" (*Bufil*, *supra*, 162 Cal.App.4th at p. 1207.) "'The class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description.' [Citations.]" (*Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1533 (*Ghazaryan*).) Ascertainability further requires that class members """"may be readily identified without unreasonable expense or time by reference to official

15

records.'"" [Citations.]" (*Id*. at p. 1532.) "[S]peculation that goes to the merits of the ultimate recovery [is] an inappropriate focus for the ascertainability inquiry." (*Bufil*, at p. 1208.)

Plaintiffs' supplemental motion sought to certify a Regular Rate Class comprised of all nonexempt California employees who worked more than an eight-hour shift at any time after February 3, 2005, and were not properly compensated because Defendants "subjected them to a base, hourly, rate-of-pay cut when working these overtime shifts." At the trial court hearing, Plaintiffs narrowed this class definition by limiting it to field employees only. Even the narrowed class definition, however, is somewhat overbroad and inconsistent with Plaintiffs' theory of recovery and the evidence Plaintiffs submitted to support their theory.

Plaintiffs base their theory of recovery for the Regular Rate Class on the allegation Defendants adopted an unlawful uniform policy that field employees who work any shift longer than eight hours are paid a lower hourly rate to offset the overtime hours included with those longer shifts. Defendants concede the annualized pay plan Bowers implemented in 2008, and Pacific implemented for all new hires in 2010, pays field employees who work a 12- or 24-hour shift a lower hourly rate than field employees who work an 8- or 10-hour shift. The paystubs Plaintiffs submitted in support of the motion confirm Defendants pay one hourly rate for 8- and 10-hour shifts and separate, lower rates for 12- and 24-hour shifts.

Accordingly, with a slight modification to acknowledge Defendants pay the same hourly rate for 8- and 10-hour shifts, Plaintiffs' theory of recovery defines a group of unnamed plaintiffs with a purported right to recover based on objective characteristics and transactional facts: all field employees who worked a scheduled 12- or 24-hour shift for Bowers after it implemented the annualized pay plan in 2008, or Pacific after it implemented the annualized pay plan in 2010, and were paid a lower regular rate than field employees working an 8- or 10-hour shift. The members of this modified class are

16

readily identifiable from Defendants' payroll records as demonstrated by Defendants paystubs, which separately list the number of hours and hourly rate for each length of shift (8, 10, 12, and 24 hours) during each pay period.

When a plaintiff's theory of recovery identifies an ascertainable class, the "[plaintiff's] rights should not be forfeited because of counsel's choice of words in the complaint or class certification motion. . . .  "'[I]f necessary to preserve the case as a class action, the court itself can and should redefine the class where the evidence before it shows such a redefined class would be ascertainable.'"  [Citation.]  'As it is the court's duty to certify an identifiable and ascertainable class, the court is not limited . . . to the class description contained in plaintiff's complaint.'  [Citation.]"  (*Marler*, *supra*, 199 Cal.App.4th at p. 1462; *Cho*, *supra*, 177 Cal.App.4th at pp. 747-748; *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915-916.)

Here, the trial court erred in finding Plaintiffs failed to identify an ascertainable class because they did not present evidence connecting the class definition to Plaintiffs' theory of recovery or showing Defendants engaged in the alleged wrongdoing during any particular time.  The trial court applied an erroneous legal standard when it found Plaintiffs' class definition failed to identify an ascertainable class because it failed to consider whether the class definition could be modified to match the identifiable group of employees described by Plaintiffs' theory of recovery.  (See *Marler*, *supra*, 199 Cal.App.4th at p. 1461 [confusing or overbroad class definition does not support denying class certification on ascertainability grounds when an objectively identifiable group of plaintiffs nonetheless exists]; *Brinker*, *supra*, 53 Cal.4th at p. 1050 ["'[A]n order based upon improper criteria or incorrect assumptions calls for reversal "'even though there may be substantial evidence to support the court's order'"'"].)

The court further erred because substantial evidence does not support its ruling.  Contrary to the court's ruling, Plaintiffs presented evidence connecting their theory of recovery, Defendants' alleged misconduct, and the time period Defendants

engaged in that conduct. Defendants' own declarations and deposition testimony specifically describe the annualized pay plan, when each Defendant implemented it, and how Defendants uniformly applied it to all field employees. We emphasize this is not a situation where we must defer to a trial court's resolution of a conflict in the evidence. Rather, we have a theory of recovery challenging an undisputed policy uniformly applied to a readily identifiable group of employees, and therefore an ascertainable class. (See *Bufil*, *supra*, 162 Cal.App.4th at pp. 1208-1209 [reversing trial court's refusal to certify class on ascertainability grounds because defendant employers' concessions regarding its policies identified an ascertainable class].)

Defendants argue Plaintiffs failed to provide admissible evidence establishing an ascertainable class, but they too ignore their own concessions regarding the annualized pay plan. Defendants further argue Plaintiffs rely on Defendants' computer-aided dispatch system as a means to identify class members without presenting admissible evidence regarding how the system works or how it can be used to identify class members. Although the dispatch system may assist in identifying potential class members, it is not necessary because the payroll records identify all field employees who worked a 12- or 24-hour shift at a lower hourly rate after Defendants implemented their annualized pay plan.

2. Numerosity

The numerosity requirement "is indefinite and has been construed liberally. Where a question is of common interest to 'many' persons, an action may be maintained as a class action even where the parties are numerous and it is in fact practicable to join them all. [Citation.] No set number is required as a matter of law for the maintenance of a class action." (*Rose v. City of Hayward* (1981) 126 Cal.App.3d 926, 934 (*Rose*).) Indeed, California courts have upheld small classes, including a class comprising only 10 people. (*Ibid.*; see, e.g., *Bowles v. Superior Court* (1955) 44 Cal.2d 574, 587 (*Bowles*)

18

[class of 10 trust beneficiaries in action to remove trustee]; *Collins v. Rocha* (1972) 7 Cal.3d 232, 234 (*Collins*) [class of 35 trust beneficiaries in action against trustee for improper conduct]; *Rose*, at p. 934 [class of 42 retirees against public employee retirement system]; *Marler*, *supra*, 199 Cal.App.4th at p. 1461 [class of 96 mobilehome park residents].)

Here, the trial court found Plaintiffs did not show numerosity because they "failed to establish any delineated time period during which any wrongdoing took place so Plaintiffs couldn't possibly establish who was in the class." The court also found Plaintiffs' evidence failed to satisfy the numerosity element because the evidence did not establish any particular number of class members.

On the ascertainability requirement, the trial court erred by applying an erroneous legal standard because it failed to consider the modified class definition revealed by Plaintiffs' theory of recovery and the supporting evidence. That error also permeates the court's numerosity analysis. Contrary to the court's findings, Plaintiffs established a delineated time period for Defendants' alleged wrongdoing and who was in the Regular Rate Class, as modified. (See *Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 154 ["the trial court is entitled to consider 'the totality of the evidence in making [the] determination' of whether a 'plaintiff has presented substantial evidence of the class action requisites [including numerosity] . . .'"].)

In addition to Gonzales' declaration, Plaintiffs submitted declarations from nine former employees who worked as field employees for Bowers at some point during or after 2008 when Bowers began using the annualized pay plan. Defendants also submitted declarations from more than 45 current or former employees who either worked as field employees for Bowers after it adopted its annualized pay plan in 2008 or started working for Pacific as field employees after it adopted its annualized pay plan and

19

began applying it to new employees in 2010.[3]  These more than 55 declarations reveal that most employees worked more than one type of shift and that many either regularly or at least occasionally worked 12-hour shifts.  Moreover, Defendants conceded the 12-hour shift was their most popular and that popularity led it to adopt the annualized pay plan.

The record also includes evidence showing these declarations represent only a portion of the field employees Defendants employed during the relevant time period.  To support the motion, Plaintiffs submitted discovery responses from Bowers showing the number of positions it had for each type of field employee for each year between 2005 and 2010.  These responses show that in 2009, the year after it adopted the annualized pay plan, Bowers had 247 EMT positions, 51 paramedic positions, 36 registered nurse positions, and 21 respiratory therapists positions for a total of 355 field employee positions covered by the annualized pay plan.  Defendants object that Plaintiffs failed to submit the actual discovery requests to show what these numbers represent, but Defendants do not contend these numbers represent anything other than the number of employees for each position during the identified time period.[4]  Moreover, in opposition to the motion, Defendants' vice-president declared that he could obtain declarations from "hundreds more" employees regarding their experiences with Defendants' pay and break policies.

Because the trial court applied an erroneous legal standard, and based on the foregoing evidence, we conclude the trial court erred in finding Plaintiffs' failed to satisfy the numerosity requirement.  Neither the trial court nor Defendants cite any

---

[3]     Defendants submitted 89 declarations from current or former employees, but some of them were either dispatch employees or field employees who were not subject to the annualized pay plan because they stopped working for Bowers before it adopted the plan or started working for Pacific before it adopted the plan.

[4]     Plaintiffs submitted the discovery requests with their supplemental reply brief, but the trial court refused to consider that brief and the evidence submitted with it. That refusal does not alter our analysis on the numerosity element.

20

authority supporting their conclusion a class proponent must establish the precise number of class members to satisfy the numerosity requirement. The evidence presented shows that, at a minimum, the number of potential Regular Rate Class members exceeds the number of class members certified in some of the foregoing cases and that is sufficient to satisfy the liberal construction given to the numerosity requirement.

3.     Predominance of Common Issues

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1021.)

"A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at pp. 1021-1022, fn. omitted; see also *Sav-On*, *supra*, 34 Cal.4th at p. 334 ["'the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate'"].)

In *Brinker*, the putative class representatives sued their employer alleging the rest break policy the employer uniformly applied to them and other similarly situated employees violated California law. The employer acknowledged the policy's existence and uniform application, but argued the policy did not violate state law. The Supreme

21

Court affirmed the trial court's decision certifying a class of all employees subject to the policy because "[t]he theory of liability — that [the employer] has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law — is by its nature a common question eminently suited for class treatment." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.)

As stated above, Plaintiffs' Regular Rate Class theory of liability is that the annualized pay plan Defendants uniformly applied to field employees is unlawful because it pays a field employee a lower, regular hourly rate when he or she works a 12- or 24-hour shift than when he or she works an 8- or 10-hour shift. According to Plaintiffs, the plan unlawfully manipulates field employees' hourly rates to evade overtime laws because it lowers the regular hourly rate paid for a 12- or 24-hour shift to offset the overtime hours included in those shifts and equalize the compensation paid to employees who work 8-, 10-, 12-, and 24-hour shifts.[5] To support this contention, Plaintiffs cite *Huntington Memorial Hospital v. Superior Court* (2005) 131 Cal.App.4th 893, which concluded "[a]n employer may not engage in a subterfuge or artifice designed to evade overtime laws." (*Id*. at p. 910; see also *id*. at pp. 904-905.)

As in *Brinker*, this theory of liability "is by its nature a common question eminently suited for class treatment." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.) Defendants concede their annualized pay plan pays field employees a lower hourly rate when they work a 12- or 24-hour shift to offset the overtime hours included in those shifts and attract more employees to the shorter shifts. Defendants also concede they uniformly apply the plan to all of Bowers' field employees and the majority of Pacific's field employees. Common proof therefore may be used to establish both the policy's

---

5   Plaintiffs also contend Defendants' annualized pay plan is illegal because it reduces the overtime rate Defendants pay field employee as well.

22

existence and terms, and whether the policy violates California law is a legal issue common to all class members.

The trial court, however, found Plaintiffs failed to provide competent evidence showing common issues predominate. As on the ascertainability and numerosity elements, the trial court erred by applying an erroneous legal standard because it failed to consider the modified class definition revealed by Plaintiffs' theory of recovery and the supporting evidence. Plaintiffs' theory challenges the uniform policy Defendants applied to all class members and whether that policy violates California law is a question eminently suited for class treatment. The policy's existence and terms may be established at trial through Defendants' testimony and documents without any individualized evidence.

Defendants contend the trial court properly found Plaintiffs failed to establish common issues predominate because (1) the *Huntington Memorial* decision on which Plaintiffs rely does not support their liability theory; and (2) *Parth v. Pomona Valley Hospital Medical Center* (9th Cir. 2009) 630 F.3d 794, holds an employer does not violate overtime laws by paying an employee working a 12-hour shift a lower hourly rate than an employee working an 8-hour shift. These arguments, however, improperly ask us to decide the merits of Plaintiffs' Regular Rate Class claims at the class certification stage. (*Brinker*, *supra*, 53 Cal.4th at p. 1023 [a class certification motion """"does not ask whether an action is legally or factually meritorious"""" and "resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided"].) We decline to do so and express no opinion on the merits of Plaintiffs' claims.

As the *Brinker* court explained, "[T]o prematurely resolve . . . disputes [regarding the claims' merits], conclude a uniform policy complies with the law, and thereafter reject class certification . . . places defendants in jeopardy of multiple class actions, with one after another dismissed until one trial court concludes there is some

23

basis for liability and in that case approves class certification. [Citation.] It *is* far better from a fairness perspective to determine class certification independent of threshold questions disposing of the merits, and thus permit defendants who prevail on those merits, equally with those who lose on the merits, to obtain the preclusive benefits of such victories against an entire class and not just a named plaintiff. [Citation.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1034, original italics.)

4.     Typicality of Class Representatives' Claims

"Certification requires a showing that the class representative has claims or defenses typical of the class." (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1090.) The typicality requirement's purpose "'is to assure that the interest of the named representative aligns with the interests of the class. [Citation.] "'Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought.'" [Citations.] The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." [Citation.] . . .'" [Citation.]" (*Seastrom v. Neways, Inc.* (2007) 149 Cal.App.4th 1496, 1502.)

The trial court found Kahane is not an adequate class representative because his declaration failed to show he had any claim against Defendants. Substantial evidence supports that finding as to the Regular Rate Class. As explained above, Bowers did not implement its annualized pay plan until 2008 and Pacific did not implement the plan until 2010. Kahane's declaration states he worked "on and off" for Bowers and Pacific from 2006 to 2008. Accordingly, he concedes he did not work for Pacific when it had the annualized pay plan and his declaration fails to show he worked a 12-hour shift for Bowers after it implemented the plan in 2008. A class representative who does not

24

have a claim against the defendants cannot satisfy the typicality requirement. (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 98 (*Medrazo*).)

The trial court made no finding regarding whether Gonzales's claims are typical of the Regular Rate Class and Defendants do not question the typicality of Gonzales's claims. Accordingly, we need not address that issue. (*Jaimez*, *supra*, 181 Cal.App.4th at pp. 1297-1298 ["When reviewing an order denying class certification, appellate courts 'consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial'"].) We nonetheless note Gonzales's Regular Rate Class claim is typical of all field employees, including EMT's, paramedics, registered nurses, and respiratory therapists, because Defendants concede they apply the annualized pay plan to all categories of field employees and the lawfulness of the plan does not turn on the position the field employee holds. To the extent any particular category of field employees does not work 12- or 24-hour shifts, they would be excluded from the Regular Rate Class based on the modified class definition discussed above.[6]

D.    *The Trial Court Erred in Refusing to Certify the Overtime Class*

1.    Ascertainability

Plaintiff's supplemental motion sought to certify an Overtime Class comprised of all hourly employees who worked a shift over eight hours after February 3, 2005, without Defendants paying them proper overtime compensation. At the trial court hearing, Plaintiffs narrowed this class definition by limiting it to field employees only. Plaintiffs base their theory of recovery for the Overtime Class on the

---

[6]    The trial court also found Plaintiffs failed to establish class certification provided a superior mechanism for resolving the Regular Rate Class claims, but it based that finding solely on the other class certification elements the court found lacking. Because we reverse the trial court's findings Plaintiffs failed to establish all other class certification elements, we also reverse the trial court's derivative finding a class action is not a superior means for resolving the Regular Rate Class claims.

25

allegations that (1) Defendants improperly relied on the 4/10 Schedule to pay all field employees overtime compensation only after they worked more than 10 hours on a shift regardless of whether the shift was a 10-hour shift covered by the 4/10 Schedule; and (2) Pacific may not apply the 4/10 Schedule to any of its field employees because it failed to report the election results for its alternative workweek schedule to the California Division of Labor Standards. According to Plaintiffs, all field employees, except those working a 10-hour shift for Bowers, should be paid overtime at the rate of one and one-half times their regular hourly rate for hours 9 through 12 of any shift and double their hourly rate after hour 12.

Defendants concede they paid all field employees working 10- and 12-hour shifts under the 4/10 Schedule Bowers' employees adopted in 2000 and Pacific's employees adopted in 2003. Based on the 4/10 Schedule, Defendants concede they paid field employees their regular hourly rate for the first 10 hours of any 12-hour shift, one and one-half times their regular hourly rate for hours 11 and 12, and double their regular hourly rate for all hours beyond 12.

Like the Regular Rate Class, the trial court found Plaintiffs failed to identify an ascertainable class because they did not present evidence connecting the class definition to Plaintiffs' theory of recovery or showing Defendants engaged in the alleged wrongdoing during any particular time. Substantial evidence does not support the court's ruling, however. Plaintiffs presented evidence connecting their theory of recovery, Defendants' alleged misconduct, and the time period during which Defendants engaged in that conduct. Defendants' declarations and deposition testimony specifically described the 4/10 Schedule, when Defendants began using that schedule, and Defendants' uniform application of that schedule to every 10- and 12-hour shift a field employee works. Again, we are not dealing with a trial court's resolution of conflicting evidence to which we must defer, but rather an undisputed policy an employer uniformly applied to a readily identifiable group of employees. (See *Bufil*, *supra*, 162 Cal.App.4th at p. 1208.)

26

Accordingly, Plaintiffs' theory of recovery and Defendants' concessions regarding the 4/10 Schedule together identify common characteristics and transactional facts that establish an ascertainable Overtime Class with a purported right to recover from Defendants: all field employees who worked a 12-hour shift for Bowers, or a 10- or 12-hour shift for Pacific, at any time after February 3, 2005, and were not paid overtime until after the shift's 10th hour. (See *Ghazaryan*, *supra*, 169 Cal.App.4th at p. 1533 ["'The class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description'"].) As on the Regular Rate Class, the Overtime Class members are readily identifiable from Defendants' payroll records, which show the different shifts all field employees worked during each pay period.

The Overtime Class Plaintiffs defined in their supplemental motion is slightly overbroad because it includes field employees who worked 10-hour shifts for Bowers under its properly adopted 4/10 Schedule and field employees who worked 24-hour shifts for either Defendant. Class certification, however, may not be denied based on a slightly overbroad class definition when the evidence otherwise identifies an ascertainable class. Instead, the class definition may be modified to correct the overbreadth, those improperly included in the class may later be dismissed, or a subclass may be established if necessary. (*Marler*, *supra*, 199 Cal.App.4th at p. 1461.) Moreover, a field employee who worked 10-hour shifts for Bowers or 24-hours shifts for either Defendant would still be a proper Overtime Class member if he or she picked up or traded for even one 12-hour shift for either employer or a 10-hour shift for Pacific. (See *Ghazaryan*, *supra*, 169 Cal.App.4th at p. 1532.) The employee declarations both sides submitted shows that even employees who customarily worked only one type of shift occasionally picked up or traded for other shifts.

27

2.      Numerosity

The trial court found Plaintiffs failed to establish the numerosity element on the Overtime Class for the same reasons it found that element lacking on the Regular Rate Class: (1) Plaintiffs "failed to establish any delineated time period during which any wrongdoing took place so Plaintiffs couldn't possibly establish who was in the class"; and (2) Plaintiffs' evidence did not establish any particular number of class members. The court erred for the same reasons discussed above on the Regular Rate Class.

First, contrary to the trial court's finding, Plaintiffs established a delineated time period for Defendants' alleged wrongdoing and who would qualify for the Overtime Class primarily through Defendants' declarations and deposition testimony describing when they implemented the 4/10 Schedule and how they uniformly applied it to all field employees who worked a 10- or 12-hour shift. As with the Regular Rate Class, the trial court's error in failing to find an ascertainable class permeates its numerosity analysis as well.

Second, as on the Regular Rate Class, the employee declarations both sides submitted and Bowers' discovery responses show, at a minimum, the number of potential Overtime Class members exceeds the number of class members previously found to satisfy the numerosity requirement. (See, e.g., *Bowles*, *supra*, 44 Cal.2d at p. 587 [10 class members]; *Collins*, *supra*, 7 Cal.3d at p. 234 [35 class members]; *Rose*, *supra*, 126 Cal.App.3d at p. 934 [42 class members].) Indeed, the Overtime Class's size will necessarily surpass the Regular Rate Class's size because its class definition identifies a broader group of field employees. Both classes include field employees who worked a 12-hour shift for either Defendant. The Regular Rate Class, however, is limited to field employees who worked for Bowers after it implemented the annualized pay plan in 2008 or were hired by Pacific after it implemented the annualized pay plan in 2010. The Overtime Class includes all field employees who worked even one 12-hour shift for either Defendant from February 3, 2005, to the present.

28

3.     Predominance of Common Issues

Labor Code section 510 requires an employer to pay employees overtime at the rate of one and one-half times the employees' regular hourly rate for any work in excess of eight hours a day or 40 hour a week.[7]  (§ 510, subd. (a); Cal. Code Regs., tit. 8, § 11090, subd. (3)(A)(1).)[8]  Any work in excess of 12 hours in one day must be compensated at twice the employee's regular hourly rate.  (*Ibid*.)

With the employees' approval, an employer may offer an alternative workweek schedule that authorizes employees to work no more than 10 hours per day and 40 hours per week without receiving overtime compensation.  (§ 511, subd. (a); Cal. Code Regs., tit. 8, § 11090, subd. (3)(B)(1).)  An alternative workweek schedule must pay the employees overtime at one and one-half times their regular hourly rate for work in excess of 10 hours per day or 40 hours per week.  Overtime must be paid at twice the employees' regular hourly rate for work in excess of 12 hours a day.  (§ 511, subd. (b); Cal. Code Regs., tit. 8, § 11090, subd. (3)(B)(1).)  An employer may not implement an alternative workweek schedule unless at least two-thirds of the affected employees approve the schedule through a secret ballot election.  (§ 511, subd. (a); Cal. Code Regs., tit. 8, § 11090, subd. (3)(C)(2).)  The employer must report the results to the California Division of Labor Standards Enforcement within 30 days after the results are final.  (§ 511, subd. (e); Cal. Code Regs., tit. 8, § 11090, subd. (3)(C)(6).)

Plaintiffs' base their theory of recovery for the Overtime Class on Defendants' alleged violation of the foregoing statutes and wage order by applying the

---

[7]     All statutory references are to the Labor Code unless otherwise stated.

[8]     The Industrial Welfare Commission (IWC) issues wage orders on an industry-by-industry basis to fix minimum wages, maximum hours of work, and conditions of labor.  (*Brinker*, *supra*, 53 Cal.4th at p. 1026.)  Ambulance drivers and attendants are subject to IWC wage order No. 9-2001, which is set forth in the California Code of Regulations at title 8, section 11090.  (See *Monzon v. Schaefer Ambulance Service, Inc.* (1990) 224 Cal.App.3d 16, 22.)

29

4/10 Schedule's overtime pay methodology to shifts for which it was not approved. According to Plaintiffs, Defendants' employees voted to approve an alternative work week schedule of 4 days per week and 10 hours per day only; they did not approve an alternative workweek schedule including 12-hour shifts. Plaintiffs contend all field employees working 12-hour shifts therefore should have received overtime pay at one and one-half times their regular hourly rate for hours 9 through 12 on all 12-hour shifts. Defendants, however, improperly applied the 4/10 Schedule to 12-hour shifts and paid overtime only on the shift's 11th and 12th hours. Plaintiffs also contend Pacific's entire 4/10 Schedule is unenforceable because Pacific failed to report it to the California Division of Labor Standards Enforcement.

The trial court refused to certify the Overtime Class because it found Plaintiffs failed to provide competent evidence showing common issues predominate or to establish the trial methodology Plaintiffs would use to show any common issues. The trial court erred by applying an erroneous standard. Because it found Plaintiffs failed to identify an ascertainable class, the trial court failed to recognize Plaintiffs based their theory of recovery on Defendants' conceded, uniform application of the 4/10 Schedule to all field employees working 10- and 12-hour shifts. By challenging the propriety of Defendants uniformly applying the 4/10 Schedule to field employees working 12-hour shifts, and field employees working 10-hour shifts for Pacific, Plaintiffs assert a liability theory that presents "a common question eminently suited for class treatment." (*Brinker*, *supra*, 53 Cal.4th at p. 1033.)

Defendants argue the trial court properly refused to certify the Overtime Class because (1) there is nothing improper about applying the 4/10 Schedule to 12-hour shifts; (2) all employees nonetheless signed acknowledgments agreeing the 4/10 Schedule applies to 12-hour shifts; and (3) any failure by Pacific to report the results of its vote to the California Division of Labor Standards Enforcement does not invalidate its 4/10 Schedule. These arguments, however, improperly ask us to affirm the trial court's

30

decision denying class certification based on the merits of Plaintiffs' Overtime Class claim. (*Brinker*, *supra*, 53 Cal.4th at p. 1023.) We decline to do so and express no opinion on the merits of Plaintiffs' claims.

4.      Typicality of Class Representatives' Claims

As on the Regular Rate Class, the trial court found Kahane is not an adequate representative because his declaration failed to show he had any claim against Defendants. Substantial evidence supports that finding as to the Overtime Class. Kahane's declaration simply states Defendants had an alternative workweek schedule and he was never compensated for all of his overtime hours. He offers no testimony regarding the types of shifts he worked or how Defendants' alternative workweek schedule deprived him of any overtime compensation. Nothing in Kahane's declaration establishes he has a claim based on Plaintiffs' theory of recovery for the Overtime Class and therefore he fails to satisfy the typicality requirement. (*Medrazo*, *supra*, 166 Cal.App.4th at p. 98 [class representative who does not have a claim against the defendants cannot satisfy typicality requirement].)

The trial court made no finding regarding whether Gonzales's claim is typical of the Overtime Class and Defendants also do not challenge the typicality of Gonzales' claim. Accordingly, we may not uphold the trial court's decision refusing to certify this class based on the typicality of Gonzales's claims. (*Jaimez*, *supra*, 181 Cal.App.4th at pp. 1297-1298.) We note in passing that both Gonzales' declaration and paystubs reveal he worked 12-hour shifts and his declaration states he did not receive overtime compensation until after he worked 10 hours on a shift.[9]

---

[9]      The trial court also found Plaintiffs failed to establish class certification provided a superior mechanism for resolving the Overtime Class claims, but it based that finding solely on the other class certification elements the court found lacking. Because we reverse the trial court's findings Plaintiffs failed to establish all other class certification elements, we also reverse the trial court's derivative finding a class action is not a superior means for resolving the Overtime Class claims.

31

E.      *Substantial Evidence Supports the Trial Court's Refusal to Certify the Remaining Classes*

1.      The Meal Break Class

An employer must provide an employee an unpaid 30-minute meal period if the employee works more than five hours per day, and a second unpaid 30-minute meal period if the employee works more than 10 hours per day.  (§ 512, subd. (a); Cal. Code Regs., tit. 8, § 11090, subd. (11)(A) & (B).)  An employer satisfies this burden by providing the employee at least 30 minutes of uninterrupted time during which the employee is relieved of all duty.  (*Brinker*, *supra*, 53 Cal.4th at p. 1036.)  If the employer fails to relieve the employee of all duty during the 30-minute meal period, the period is considered an "'on duty' meal period" and counted as time worked.  An on duty meal period is permitted only when the nature of the work prevents the employee from being relieved of all duty and the employer and employee have agreed in writing to an on duty meal period.  (Cal. Code Regs., tit. 8, § 11090, subd. (11)(C).)

"[A]n employer may not undermine a formal policy of providing meal breaks by pressuring employees to perform their duties in ways that omit breaks," but "the employer is not obligated to police meal breaks and ensure no work thereafter is performed."  (*Brinker*, *supra*, 53 Cal.4th at p. 1040.)  An employer satisfies its meal period obligations by providing the employee bona fide relief from duty for 30-minutes; the employer does not violate its obligations if the employee voluntarily performs work during the period.  (*Id*. at pp. 1040-1041.)

Plaintiffs' supplemental motion defined the Meal Break Class as all hourly employees Defendants employed from February 3, 2005, to the date of judgment "who were not provided legally compl[ia]nt meal periods."  To support their theory of recovery, Plaintiffs argued (1) Defendants failed to provide Plaintiffs an opportunity to

32

take uninterrupted meal breaks because Defendants had Plaintiffs "constantly running calls," and (2) Defendants never paid any field employee for a missed meal break.[10]

To support this theory, Plaintiffs submitted a declaration from Gonzales explaining, "[I]t often occurred that the needs of patients and available staff made it necessary to continue working without taking a break. I have had to miss meal . . . breaks because we are constantly running multiple pick-ups, such that I am never afforded a half-hour uninterrupted meal period." Plaintiffs also submitted declarations from a few other former field employees who declared "there would be days I would not take a thirty (30) minute break"; "I did not always get a thirty (30) minute meal break because our supervisors and managers did not allow us to and when I asked for a meal break they told me to keep taking calls"; "I was lucky if I got one Meal Break per shift"; and "[m]y meal breaks were interrupted by work activities." Finally, Plaintiffs submitted Defendants' written meal break policy, which (1) acknowledged each employee who worked five or more hours in a day was entitled to a 30-minute unpaid meal break; (2) required supervisors to schedule meal breaks; and (3) prohibited employees from skipping meal breaks without obtaining written approval in advance.

Defendants opposed the class certification motion with declarations from several dispatchers who testified they were trained on Defendants' policy of providing field employees their mandated meal breaks, they avoided assigning a call to field employees who were on a meal break, and, in the rare instance an emergency call had to be assigned to field employees who were on break, they attempted to have the employees make up the break later in the shift. Defendants also submitted declarations from numerous field employees who testified they were always provided meal breaks, their supervisors never instructed them not to take a meal break, and they were always

---

[10] In the trial court, Plaintiffs also argued Defendants required employees to sign meal period waivers for a second meal break during 10- and 12-hour shifts, but Plaintiffs have abandoned that theory of recovery on appeal.

provided the opportunity to make up any break an emergency call interrupted or delayed. Finally, Defendants' evidence also explained the amount of downtime each field employee experienced between calls varied greatly depending on the unique circumstances of each individual shift an employee worked, including the area covered by the shift, the time of day, the pickup and drop off locations for each call, the amount of time needed to complete a call, and even the time of the year.

After reviewing the evidence, the trial court refused to certify the Meal Break Class because Plaintiffs' theory of recovery did not present a common issue that could be proven on a classwide basis. The court explained Plaintiffs' theory that Defendants denied them legally compliant meal breaks by constantly assigning calls to them "would take evidence of each such event, as to each class member in order to establish liability."

Whether common issues predominate on Plaintiffs' theory of recovery is a factual question we review under the substantial evidence standard. (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) In doing so, we must defer to the trial court on "'questions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony . . . .' [Citation.]" (*Sav-On*, *supra*, 34 Cal.4th at p. 334.)

Under these standards, we find the foregoing evidence reasonably supports the trial court's finding common issues do not predominate on Plaintiffs' theory of recovery. This evidence shows Defendants' only express policy regarding meal breaks required field employees to receive legally compliant breaks. Plaintiffs do not argue or identify any uniform policy or practice of Defendants to deny or provide noncompliant meal breaks by assigning field employees too many calls to allow time for a break. Instead, Plaintiffs provide anecdotal evidence regarding a few employees' experiences when the need of patients and available staff made it necessary to keep working without

34

taking a full break.  (*Brinker*, *supra*, 53 Cal.4th at p. 1052 [class proponent must present substantial evidence of a uniform policy or practice; "anecdotal evidence of a handful of individual instances" not sufficient to establish common issues predominate]; *Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341, 1368 [trial court properly denied class certification when plaintiff's evidence failed to establish "articulable companywide policy which could be used to establish classwide liability"].)

Defendants provided evidence describing how the downtime available for breaks varied greatly from field employee to field employee based on the individual circumstances of each shift they worked.  Defendants also presented evidence regarding the dispatchers' efforts to ensure field employees received meal breaks and the testimony of numerous field employees stating they always received their meal breaks.  The trial court credited Defendants' evidence and viewed Plaintiffs' evidence as presenting individualized instances of a few employees missing breaks because of the unique circumstances of their shift.  We must accept that reasonable interpretation of the evidence.  (*Sav-On*, *supra*, 34 Cal.4th at p. 328 [""""the reviewing court has no authority to substitute its decision for that of the trial court"""""]; *Mora*, *supra*, 194 Cal.App.4th at p. 509 [appellate court must accept trial court's finding common issues do not predominate if supported by substantial evidence].)

Accepting the trial court's interpretation, Plaintiffs' theory of recovery presents a host of individual issues requiring separate adjudications concerning the reasons each field employee missed each break, not a common question on whether Defendants had a uniform policy or practice to deny or provide noncompliant meal breaks contrary to California law.  Accordingly, we find the trial court did not err in

refusing to certify the Meal Break Class based on the predominance of common issues requirement.[11]

Plaintiffs nonetheless argue we should conclude the trial court erred based on new theories of recovery Plaintiffs never raised in the trial court. Specifically, Plaintiffs contend the Meal Break Class should be certified based on the theories that Defendants failed to provide legally compliant meal breaks by (1) requiring employees to remain close to their ambulances during meal breaks; (2) implementing a policy requiring employees to obtain written management approval before missing a meal break, while giving the employer discretion to schedule the break; (3) implementing a new policy after this litigation began that provides meal breaks after the sixth hour of a shift; and (4) precluding employees from taking a second 30-minute meal break when working shifts longer than 12 hours. We decline to consider these theories of recovery as a basis for certifying the Meal Break Class because Plaintiffs failed to raise them in the trial court. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767; *Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 498, fn. 9 [plaintiff cannot assert a new theory of liability for the first time on appeal]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2012) ¶¶ 8:229-8:230, pp. 8-155 to 8-156 (rev. # 1, 2011).)

Acknowledging they did not raise these theories in the trial court, Plaintiffs contend we still may consider the issue because their theories present questions of law based on undisputed facts. According to Plaintiffs, these new theories simply rely on clarifications to California's meal break law that the Supreme Court's *Brinker* decision made *after* the trial court rejected Plaintiffs' supplemental certification motion. Plaintiffs assert we are required to apply this new law in reviewing the trial court's ruling. This

---

[11] Because we find this ground supports the trial court's refusal to certify the Meal Break Class, we need not address the additional grounds on which the trial court based its decision.

36

argument misses the mark because it misconstrues the court's inquiry on a class certification motion and mischaracterizes the nature of these new theories.[12]

As stated above, whether common issues predominate on Plaintiffs' theory of recovery is a factual question we review under the substantial evidence standard. (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) In deciding this class certification requirement, the trial court must consider "whether the elements necessary to establish liability [on Plaintiffs' theory] are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence." (*Id.* at p. 1024.) The party seeking class certification must present substantial evidence to show common issues predominate on its theory of recovery (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 689) and the opponent is allowed to present evidence to show individual issues predominate (see, e.g., *Mora*, *supra*, 194 Cal.App.4th at pp. 508-509). Allowing Plaintiffs to raise new theories of recovery on appeal would deprive Defendants of the opportunity to present evidence on the issues raised by those theories. For example, considering these new theories would deny Defendants the opportunity to present evidence on whether the purported policies on which these theories rely exist and, if so, how those policies operate. (See *Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 594 [it is unjust to the opposing party to allow a new theory on appeal that requires consideration of new factual questions].)

---

[12] We emphasize these new theories are not simply refinements to the theory of recovery Plaintiffs argued in the trial court or a modification of the class definition as on the Regular Rate Class above. Rather, these are entirely new theories for imposing liability on Defendants even though they still fall within Plaintiff's class definition of all employees who were not provided legally compliant meal breaks.

2.      The Waiting Time Class

Section 201 requires an employer to immediately pay an employee all wages due upon termination and section 202 requires an employer to pay an employee all wages due within 72 hours of the employee resigning.  (§§ 201, 202.)  If an employer willfully fails to pay wages due upon terminations or resignation, section 203 requires an employer to pay waiting time penalties.  (§ 203.)

Plaintiffs' theory of recovery for the Waiting Time Class is that Defendants failed to pay Plaintiffs and all other class members their regular and overtime compensation when they left Defendants' employment.  According to Plaintiffs, this claim is derivative of all other claims relating to Defendants' failure to properly pay regular and overtime compensation.

The trial court refused to certify this class because it found Plaintiffs failed to present competent evidence establishing common issues predominate.  We find substantial evidence in the record supports the trial court's ruling.  Plaintiffs failed to explain or show how their theory of recovery for this class presented a common issue likely to prove amendable to class treatment.  (See *Brinker*, *supra*, 53 Cal.4th at p. 1021.) Unlike the Regular Rate Class or the Overtime Class, Plaintiffs do not present evidence of a formal or informal policy under which Defendants uniformly refused to pay employees their wages upon termination or resignation.  Instead, Plaintiffs simply claim they were not paid all wages due when they stopped working for Defendants.

The trial court sustained Defendants' evidentiary objections to the single sentence in Gonzales's declaration addressing the wages he was paid "on [his] separation from Bowers" and therefore the only evidence relating to the Waiting Time Class is Kahane's declaration stating he did not immediately receive his final paycheck upon termination.  That does not constitute substantial evidence of a uniform or classwide policy amendable to class treatment.  (See *Brinker*, *supra*, 53 Cal.4th at p. 1052

38

[anecdotal evidence from handful of employees on how their employer treated them does not establish a common issue amenable to class treatment].)

   3.  The Paystub Class

   Section 226, subdivision (a), requires employers to provide employees "an accurate itemized statement" showing, among other things, "total hours worked by the employee" and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate . . . ."  (§ 226, subd. (a).)  An employee may recover statutory damages if he or she suffers injury "as a result of a knowing and intentional failure by an employer" to provide a proper wage statement.  (§ 226, subd. (e)(1).)

   The statute's injury requirement is not satisfied simply because the wage statement fails to provide all required information.  The employee must demonstrate he or she suffered "*an injury arising from the missing information*. . . .  [T]he deprivation of that information, standing alone is not a cognizable injury.  [Citation.]"  (*Price v. Starbucks Corp.* (2011) 192 Cal.App.4th 1136, 1142-1143, italics added, fn. omitted.)  The need for an employee to perform simple math to confirm he or she received the proper compensation does not satisfy the injury requirements.  (*Id*. at pp. 1143-1144; *Alonzo v. Maximus, Inc.* (C.D.Cal. 2011) 832 F.Supp.2d 1122, 1136.)

   Plaintiffs' supplemental motion defined the Paystub Class as all hourly employees Defendants employed "from February 3, 2005 to the date of judgment who were not provided pay stubs that complied with . . . § 226, as they fail[ed] to list total hours worked and fail[ed] to properly calculate employees['] regular rate of pay."  Plaintiffs theory of recovery on this class is that they were injured because Defendants' paystubs provided them with inaccurate information.

   The trial court refused to certify the Paystub Class because Plaintiffs failed to show how they suffered the requisite injury or that an injury arising from Defendants'

paystubs could be established on a classwide basis. Substantial evidence supports the trial court's ruling. Plaintiffs failed to identify a single injury arising from Defendants' alleged omission of pertinent paystub information or its failure to provide accurate information. Indeed, Plaintiffs failed to identify any required information Defendants paystubs either failed to provide or inaccurately provided.[13]

Plaintiffs contend Defendants violated section 226 in two distinct ways. First, Defendants failed to include the "total hours worked" on the paystubs. A paystub complies with section 226 if it provides the total regular hours worked and the total overtime hours worked; the employer is not required to include a separate category providing the sum of those two figures. (*Morgan v. United Retail Inc.* (2010) 186 Cal.App.4th 1136, 1147.) Here, Defendants' paystubs included separate categories providing the total number of hours worked at every possible hourly rate: (a) the 8-, 10-, and 24-hour rate; (b) the 12-hour rate; (c) the time and a half rate for 8-, 10-, and 24-hour shifts; (d) the time and a half rate for 12-hour shifts; (e) the double time rate for 8-, 10-, and 24-hour shifts; and (f) the double time rate for 12-hour shifts. Although not required, Defendants' stubs also added all these categories together to provide a "gross" number of hours worked for the entire pay period. Accordingly, Plaintiffs' contention the paystubs failed to provide total hours worked is patently false on the face of the stubs and could not possibly result in any injury under section 226.

Plaintiffs' second alleged failure to comply with section 226 is the failure to "properly calculate employees['] regular rate of pay." This claim is derivative of Plaintiffs' Regular Rate Class claim and asserts the paystubs failed to comply with section 226 because they use the lower hourly rate established by Defendants' annualized pay plan to calculate regular and overtime compensation for 12-hour shifts. The use of

---

[13]     Because we find substantial evidence supports the trial court's finding Plaintiffs failed to show common issues predominate on the Paystub Class, we do not address the additional grounds on which the trial court refused to certify this class.

that regular rate, however, is not a failure to accurately identify the "applicable hourly rates in effect during the pay period." (§ 226, subd. (a).) Indeed, Defendants' paystubs clearly identify all hourly and overtime rates established by Defendants' annualized pay plan and other pay policies. Any purported injury Plaintiffs or the other class members suffered resulted from Defendants' annualized pay plan, not from a violation of section 226. Plaintiffs fail to identify any potential inaccuracy or omission in Defendants' paystubs amenable to class treatment.

## III

### DISPOSITION

We affirm the trial court's order denying Plaintiffs' supplemental class certification motion on the Meal Break, Waiting Time, and Paystub Classes. We reverse the trial court's order denying Plaintiffs' supplemental motion to certify the Regular Rate and Overtime Classes. We remand the matter to the trial court with directions to certify the Regular Rate and Overtime Classes based on modified class definitions consistent with the views expressed herein. In the interest of justice, all parties shall bear their own costs on appeal.

ARONSON, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.

41